828 So.2d 16 (2002)
PLAQUEMINES PARISH GOVERNMENT
v.
RIVER/ROAD CONSTRUCTION, INC., and United States Fidelity and Guaranty Insurance Company.
No. 2001-CA-2222.
Court of Appeal of Louisiana, Fourth Circuit.
August 28, 2002.
Writ Denied November 22, 2002.
*18 Michael L. Mullin, Assistant Parish Attorney, Plaquemines Parish Government, Chasse, LA, Attorney for Plaintiff/Appellant.
Collin J. LeBlanc, John P. Wolff, III, Keogh, Cox & Wilson, Ltd, Baton Rouge, LA, and Rainer Lorenz Law Office of Rainer Lorenz, Covington, LA, Attorneys for Defendants/Appellants.
(Court composed of Judge STEVEN R. PLOTKIN, Judge JAMES F. McKAY, III, Judge TERRI F. LOVE).
*19 JAMES F. McKAY, III, Judge.
STATEMENT OF FACTS AND PROCEDURE
Early in the spring of 1991, River Road Construction, Inc. (River Road) was awarded a contract by the U.S. Army Corps of Engineers to raise a hurricane protection levee for the benefit of Plaquemines Parish (Parish), Project No. DACW 29-91-C-0007. The project required River Road to obtain and place on the levee substantial quantities of borrow materials, i.e. suitable earth material from an acceptable borrow pit, and brought to the site for placement. The Federal Government offered River Road, at no cost, a tract of land at Fort Jackson, which the Parish owned. River Road in preparation to begin to work on the project looked for a more convenient source for the borrow materials and chose the "Popovich Tract" in Empire, Louisiana, which was owned by First Equity Inc. (First Equity). Before agreeing to purchase the land from First Equity, Jens Lorenz, River Road's president, met with Parish President Luke Petrovich, and Councilwoman Germaine Curley to get assurances that the Parish would allow the land to be used as a borrow pit and to obtain the necessary permits.[1] Jens Lorenz was advised that it was Parish policy that before a permit would be issued that as a precondition River Road would agree to refill the borrow pit and post a surety reclamation bond in an amount sufficient to cover the refilling costs. On April 29, 1991, River Road filed an application for the permit. On June 17, 1991, the Parish approved River Road's application for the construction permit, building/construction permit No. 0-91-3879, which included the requirements that the borrow pit be refilled and that River Road post a surety bond in the amount of $252,000. River Road furnished the surety bond in favor of the Parish in the amount specified, naming itself as the obligor/principal and the Parish as obligee/beneficiary. On June 14, 1991, United States Fidelity & Guaranty Insurance Company (USF & G) issued the surety bond guaranteeing the performance of the permit requirements. River Road proceeded to excavate the area and use the materials for the levee project.
On February 8, 1996, appellants filed a civil right action against the Parish in the United States District Court for the Eastern District of Louisiana, alleging a violation of equal protection rights and the due process of law in the enforcement of the permit refilling requirements. The Parish filed a counterclaim in the federal lawsuit on June 6, 1996. On January 17, 1997, the Plaquemines Parish Government filed a petition in the 25th JDC for enforcement of the breached construction permit issued in favor of River Road, alleging River Road's failure to fill the borrow pit. On January 29, 1997, the U.S. District Court dismissed appellants' federal claims with prejudice but dismissed the Parish's counterclaim without prejudice. On February 10, 1997, River Road and USF & G filed an exception of prescription, which the trial court denied; the trial court's judgment was affirmed by this Court. On July 20, 1999, the Louisiana Supreme Court granted appellants' writ of certiorari allowing them to re-urge their position on appeal, in the event of an adverse judgment. On September 12, 2001, the trial court rendered a judgment in favor of the Parish and awarded the amount of $252,000, plus legal interest.
*20 The appellants argue that the trial court erred in enforcing the conditions of the construction permit and not finding that the Parish was in violation of due process and equal protection under the law. Additionally, they re-urged their prescription claim.
The Parish contends that the trial court erred in awarding damages in the amount of the surety bond, $252,000, as the amount does not reflect the actual cost of refilling the borrow pit.
STANDARD OF REVIEW
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart, supra. Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts, not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell, 650 So.2d at 745.
PRESCRIPTION
The appellants re-urge the issue of prescription, which the Supreme Court granted, pursuant to a writ of certiorari.[2] Appellants site as authority, La. R.S. 9:5625.[3]
L.R.S. 9:5625 provides:
"A. All actions civil or criminal, created by statute, ordinance or otherwise, ... which may be brought by parishes, municipalities or their instrumentalities or by any person, firm or corporation to require enforcement of and compliance with any zoning restriction, building restriction or subdivision regulation, imposed by any parish, municipality or their instrumentalities, and based upon the violation by any person, firm or corporation of such restriction or regulation, must be brought within two years from the first act constituting the commission of the violation; provided, that where a violation has existed for a period of two years prior to August 1, 1956,... the action must be brought within one year from and after August 1, 1956, and provided further that with reference to violations of use regulations all such actions, civil or criminal, ... must be brought within two years from the date the parish, municipality and their properly authorized instrumentality or agency if such agency has been designated, first had been actually notified in writing of such violation ... any prescription heretofore accrued by the passage of two years shall not be interrupted, disturbed *21 or lost by operation of the provisions of this section.
B. In all cases where the prescription provided for herein has accrued, the particular property involved in the violation of the zoning restriction, building restriction or subdivision regulation shall enjoy the same legal status as land uses, construction features of buildings or subdivisions made nonconforming by the adoption of any zoning restriction, building restriction or subdivision regulation...."
The pertinent queries for this Court are whether the correspondence between the Parish and River Road president Jen Lorenz can be interpreted to be acts of admission, which would suspend the prescriptive period of two years from the first act constituting the commission of the violation. We must also consider whether filing suit in the U.S. District Court interrupted prescription. Finally, we must determine if the trial court erred in denying appellants' prescription exception.
On June 17, 1991, the construction permit, subject to contractual obligations, was issued to River Road.[4] On March 31, 1993, the Parish inquired as to progress of the refilling of the borrow pit. On May 10, 1993, Jen Lorenz admitted that River Road had an obligation to refill the pit and requested additional time as there was additional dirt in the pit that was still available for River Road to sell, clearly, indicating a profit motive. This letter requesting patience from the Parish seems to indicate that River Road was in the process of bidding on another levee project and wished to use the borrow pit for the new project.[5] On May 28, 1993, the Parish responded to this request through its president, Luke Petrovich, stating:
This contract arrangement will not allow us to wait until July 1995. We will have to call for the filling of the pit at this time under our present arrangement. If you seek additional time through 1995 by amending the existing contract or permit you will have to apply for such a permit which will require the approval of the Plaquemines Parish Council and the parish President.
On March 30, 1994, over a year since the Parish inquired as to the progress of the refilling of the pit, River Road repudiated its obligation claiming unfair treatment based on the assertion that there were other borrow pits in Plaquemines Parish which were not subject to the refilling requirement. On May 2,1994, the Parish sent a letter to USF & G apprising them that River Road had defaulted on the contractual agreement to refill the pit and demanded the performance of the curative work as stated in the construction permit or relinquishment of the $252,000 surety bond.
On February 8, 1996, River Road filed its federal claim, which on January 29, 1997 was dismissed with prejudice on summary judgment. Before this dismissal from the U.S. District Court, the Parish filed, in the 25th Judicial District Court, a petition to enforce the construction permit, seeking performance and damages as an alternative remedy. It is evident from the record that there was continuous negotiations and correspondence between the parties. Moreover, River Road continued to excavate mud and clay from the borrow pit on the "Popovich Tract".
La. C.C. art. 3464 states that prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe. *22 La. C.C. art. 3466 states that: if prescription is interrupted, the time that has run is not counted. Prescription commences to run anew from the last day of interruption. At the outset, we observe that prescription statutes are to be strictly construed against prescription and in favor of the obligation sought to be extinguished. Lima v. Schmidt, 595 So.2d 624 (La.1992). The Louisiana Supreme Court has held that the burden of proof is on the plaintiff to prove whether prescription is suspended, interrupted or renounced. Id. at 628. This circuit has consistently followed the pronouncements in Lima with a plethora of decisions on the issue of acknowledgement. Our Louisiana Supreme Court in Lima, after a litany of interpretation form various doctrinal writings concerning acknowledgement, said:
Acknowledgment is a simple admission.... A simple admission does not result in new legal ties. It only shows that the debt is not extinguished, that the creditor was not negligent, that the owner had a reason for not acting to preserve his right....
Acknowledgment interruptive of prescription results from any act or fact which contains or implies the admission of the existence of the right. It can be express or tacit.... [I]t can result from... an offer made by the debtor even if not accepted by the creditor, at least if it is not conditional or in the nature of a mutual settlement....
Id. at 633 (citing 5 Civil Law Translations, Baudry, Lacantinerie & Tessier, Prescriptions, งง 476, 527-35)
A tacit acknowledgment occurs when a debtor performs acts of reparation or indemnity, makes an unconditional offer or payment, or lulls the creditor into believing he will not contest liability. Conversely, mere settlement offers or conditional payments, humanitarian or charitable gestures, and recognition of disputed claims will not constitute acknowledgments. These generalizations are reflected in the host of cases addressing the issue of what constitutes a tacit acknowledgment. Our courts have added to the above generalizations other criteria that evidence an acknowledgment, including undisputed liability, repeated and open-ended reassurances of payment, and continuous and frequent contact with the creditor throughout the prescriptive period. Conversely, our courts have recognized that mere recognition of a disputed claim, conditional payments, and settlement or compromise offers or negotiations do not evidence an acknowledgment.
Lima, Supra, at 634.
Furthermore, an acknowledgment is the recognition of the creditor's right or obligation that halts the progress of prescription before it has run its course. It involves an admission of liability, either through explicit recognition of a debt owed, or through actions of the debtor that constitute a tacit acknowledgment. Acknowledgment may be made verbally, in writing, by partial payment, by payment of interest or by pledge, or in other ways; or it may be implicit or inferred from the facts and circumstances. A tacit acknowledgment arises from a debtor's acts of reparation or indemnity, unconditional offers or payments, or actions, which lead the creditor to believe that the debtor will not contest liability. Gary v. Camden Fire Ins. Co., 96-0055, (La.7/2/96), 676 So.2d 553, 556.
In an unpublished opinion in this matter,[6] we affirmed the trial court's denial of the exception of prescription. Upon review, *23 we concur with the majority's opinion and its analysis addressing the prescription issue.
In Jens Lorenz's letter to Councilwoman Curley, dated May 10, 1993, his plea for patience clearly indicates that River Road was seeking more time to fulfill its obligation. It also indicates that it intended to perform its obligation to fill the pit, which is construed to be an act of acknowledgement thereby, interrupting prescription. The Parish did not reject this plea for patience, in fact Parish President Petrovich, as evidenced by his letter of May 28, 1993, instructs Jens Lorenz to request an amendment to the construction contract, as the requested additional time would need Parish Council approval. The Parish did not revoke the construction permit and River Roads continued to profit from its excavations of the site. On March 30, 1994, almost a year after asking for additional time to continue the excavation project, River Road sends a letter to the Parish disputing its obligation to refill the pit, again constituting an interruption of prescription and causing the prescription date to be March 30, 1996.
On February 8, 1996, which is within the prescriptive period for the Parish to file for the enforcement of the construction permit agreement, River Road filed suit in U.S. District Court alleging constitutional violations and seeking to enjoin the Parish from enforcing the contract requiring River Road to fill the excavated pit. Appellants argue that the filing of the federal suit did not suspend prescription, and that prescription was not suspended until the Parish's counterclaim was filed.
Prescription may be interrupted by the filing of a lawsuit pursuant to La.Civ.Code art. 3462, or by the debtor's acknowledgement of the obligation as provided by La. Civ.Code art. 3492. La.Civ.Code art. 3462 provides that prescription is interrupted when suit is filed in a court of competent jurisdiction. On the surface it appears that the counterclaim was filed outside the two-year limit. However, an examination of appellants' federal petition reveals that the appellants sought to enjoin the Parish from enforcing the contract to refill the pit and from seeking damages against River Road.
The prescriptive period was suspended on February 8, 1996, due to the appellants' filing of the federal civil rights suit and could not have commenced again until January 29, 1997, at the earliest, when the U.S. District Court dismissed the appellants' claims with prejudice. If the Parish had filed its action for enforcement of the contract, as it did on January 17, 1997, it would have been met with an exception of lis pendens. The Parishes' federal counterclaim did not raise a wholly new demand. The enforcement of the contract was a justiciable controversy, which was before the court. Therefore, appellants' filing of the federal petition suspended the two-year prescriptive period until the action was dismissed on January 29, 1997.
Although, La. R.S. 9:5625 applies to the case sub judice, which at the time of the action was a two-year prescriptive period, the trial court correctly found that prescription had not run. "... River Road promised to refill the pit at the time of the completion of the project, requested forbearance in that endeavor to allow them to make more money selling dirt, and then filed a litigation in federal court seeking to enjoin that obligation. They have defended this litigation by raising prescription and what the Court considers to be frivolous equal protection arguments and have greatly delayed the fulfillment of their contractual obligation."
The evidence shows that the Parish cause of action was timely filed for a number *24 of reasons. First, River Road acknowledged its liability on May 10, 1993, and repudiated the same on March 30, 1994. River Road then filed a suit on its Federal claim on February 8, 1996, which suspended the prescription of the Parishes' claim until its resolution. Finally, the parish filed in the 25th JDC, its petition for the enforcement of the permit provisions prior to the conclusion of the federal proceedings. Therefore, we affirm the trial court's judgment denying the defendants' exception of prescription.
CONSTITUTIONAL ISSUES
The appellants aver that the trial court erred in denying their claims of due process of law under Article 1, ง 2 of the Louisiana Constitution, and equal protection under the law pursuant to Article 1, ง 3 of the Louisiana Constitution. The basis of their argument is the manner in which the construction permit was issued as its was predicated upon River Road's agreement to re-fill the borrow pit. The trial court held that the appellants failed to present sufficient evidence to establish any such constitutional violations.
DUE PROCESS
The appellants contend that the Parish breached River Road's due process rights since there was no standard governing its request for the construction permit, alleging that other contractors were not required to refill their borrow pits as a condition of procuring a construction permit. Appellants also allege that there was a lack of adequate notice as to the standards that govern property uses.
Pursuant to the Fourteenth Amendment to the United States Constitution and La. Const. Art. I, ง 2 of the Louisiana Constitution of 1974, a person is protected against a deprivation of his life, liberty, or property without "due process of law." Unlike the Louisiana Constitution's provision on equal protection, which is distinct from that provided in the Fourteenth Amendment, its guarantee of due process does not vary semantically from the Due Process Clause of the Fourteenth Amendment. Progressive Security Insurance Co. v. Foster, 97-2985, (La.4/23/98), 711 So.2d 675, 688. Consequently, federal jurisprudence is relevant in determining the nature and extent of La. Const. Art. I, ง 2's due process protection.
The meaning of procedural due process is well-settled. Persons whose rights may be affected by state action are entitled to be heard at a meaningful time and in a meaningful manner, and in order that they may enjoy that right, they must first be notified. In re Adoption of B.G.S., 556 So.2d 545, 549 (La.1990). For due process to apply, the private interest which will be affected by state action must be constitutionally cognizable. Id. If it is, then it becomes necessary to evaluate what specific process is due under the particular circumstances presented.
In the instant matter, River Road was clearly notified that it would be required to refill the borrow pit and obtain a surety bond in the amount of $252,000, prior to being granted the construction permit, which they actively urged the Parish to grant. The Army Corp of Engineers initially offered River Road another piece of land, at Fort Jackson, to use as a borrow pit for the levee project free of cost.[7] River Road chose an alternative piece of property, the "Popovich Tract", based on logistical and profitability interests. From the very beginning of negotiations with the Parish, River Road knew of the conditions that needed to be fulfilled prior to procuring a construction permit, *25 including formalizing a surety bond to assure the performance of their obligations; River Road did so without any objection or further inquiry. Clearly, appellants' have no basis for their assertion that they received no adequate notice of the standards for obtaining a construction permit. Moreover, the Parish provided and placed in the record numerous examples of these same conditions required of other applicants prior to River Road's application for the permit. The record is void of any complaints from River Road as to the conditions it agreed to until Jen Lorenz's letter to the Parish, dated March 30, 1994, wherein he repudiated the contractual obligations. There is no merit to appellants due process argument.
EQUAL PROTECTION
The Louisiana Supreme Court recognized in Sibley v. Board of Supervisors of Louisiana State Univ., 477 So.2d 1094 (La.1985), that Louisiana, in Article I, Section 3 of its constitution, rejected the federal three-tiered system of equal protection analysis. Interpreting Article I, ง 3 in Sibley, the Court held:
Article I, Section 3 commands the courts to decline enforcement of a legislative classification of individuals in three different situation: (1) When the law classifies individuals by race or religious beliefs, it shall be repudiated completely; (2) When the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, its enforcement shall be refused unless the state or other advocate of the classification shows that the classification has a reasonable basis; (3) When the law classifies individuals on any other basis, it shall be rejected whenever a member of a disadvantaged class shows that it does not suitably further any appropriate state interest. With the adoption of these guarantees Louisiana moved from a position of having no equal protection clause to that of having three provisions going beyond the decisional law construing the Fourteenth Amendment.
Sibley, 477 So.2d at 1107-8.
The system created by Article I, ง 3, and the interpretation placed upon it by the Louisiana Supreme Court in Sibley, shifted the focus from that of determining under which category a particular case falls (strict, intermediate, or minimum scrutiny), which then all but decided the case, to that of conducting an independent review of the specific merits of the individual case. This necessarily entails a balancing or comparative evaluation of governmental and individual interests. Sibley, 477 So.2d at 1107; Allen v. Burrow, 505 So.2d 880 (La.App. 2d Cir.1987). Cf. Pierre v. Administrator, Louisiana Office of Employment Sec., 553 So.2d 442 (La. 1989); Kirk v. State, 526 So.2d 223 (La. 1988).
Article I, ง 3, entitled "Right to Individual Dignity" provides:
No person shall be denied the equal protection of the laws. No laws shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime. This portion of the constitution commands courts to reject enforcement of a legislative classification of individuals under the following circumstances:
(1) When the law classifies individuals by race or religious beliefs, it shall be repudiated completely;

*26 (2) When the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, its enforcement shall be refused unless the state or other advocate of the classification has a reasonable basis;
(3) When the law classifies individuals on any other basis, it shall be rejected whenever a member of a disadvantaged class shows that it does not suitably further any appropriate state interest.
River Road and USF & G contend that the Parish allegedly spared some land owners of the condition to refilling their pit and did not use any standard to guide the issuance of the permits; thus, River Road and USF & G were deprived of an equal treatment under Art. I, ง 3.
In Livingston Downs Racing Assoc., Inc. v. State, 96-2890 (La.12/2/97), 705 So.2d 149, 154, our Louisiana Supreme held that:
Individuals challenging a legislative classification based on grounds other than discrimination because of birth, race, age, sex, social origin, physical condition, or political or religious ideas must show that the law was unreasonable, or that it did not further any appropriate state interest. Sibley, 477 So.2d at 1108. Recently, we followed this same legal principle when we decided Manuel v. State, 95-2189 (La.7/2/96), 677 So.2d 116[692 So.2d 320, 338], which involved a minimum drinking age. Classifications on any basis other than those expressed in Art. I, ง 3, are reviewed under the minimum standard and must be rationally related to a legitimate governmental purpose ... Case law shows that the equal protection clause does not forbid classification. However, where such legislation is enacted, the classification must be reasonable and not arbitrary, and must rest upon some basis of difference with a fair and substantial relation to the object of the legislation. All persons similarly situated must be treated identically. Stated differently," It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992), citing F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920).
The claim of selective enforcement of the law urges a denial of equal protection under the United States and Louisiana constitutions. The conscious exercise of some selectivity in enforcement is not in itself a constitutional violation. In order to allege grounds supporting a denial of equal protection, it must be stated that the selection was deliberately based on an unjustifiable standard such as race, religion or other arbitrary classification. Board of Examiners of Certified Shorthand Reporters v. Neyrey, 542 So.2d 56, 65 (La. App 4 Cir. !989), citing, Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); State ex rel. Guste v. K-Mart Corporation, 462 So.2d 616 (La. 1985).
In this matter, as evidenced by the record, the Parish established that there were numerous other borrow pit owners that were assessed the duty to refill the borrow pits after the work was completed. Conversely, there were some borrow pit owners who were not required to refill the borrow pits but were allowed to file for alternate uses for the unfilled pit, such as lagoons for recreational activities or for protection of wildlife. While it may be interpreted to be a selective enforcement it does not equate with a violation of the equal protection of the law. With that being said, the appellants have failed to present a colorable argument that they are *27 a suspect class. Moreover, River Road rejected the Army Corp of Engineers' cost free offer of the property at Fort Jackson to be used as the borrow pit for the levee project, but for profit and convenience River Road chose to use the "Popovich Tract." First Equity, the owner of the "Popovich Tract" required that River Road obtain a Parish construction permit prior to purchasing the "Popovich Tract", which River Road pursued and ultimately did purchase the tract. River Road with full knowledge voluntarily contracted with the Parish and accepted the conditions to refill the borrow pits to secure the issuance of the construction permit. River Road then went on to request patience and additional time to further excavate the site for a clear profit motive, but never formally requested the extension from the Parish, as instructed. Three years later River Roads initiated a constitutional right violation claim in the U.S. District Court, which was dismissed on summary judgment with prejudice.
Clearly, the appellants have not alleged nor proven that they are a members of a suspect class as enunciated above. Furthermore, the Parish clearly established that there was an acute State interest in protecting the health, safety and welfare of its citizens in requiring that the borrow pit be refilled. In fact there are six houses within 500 feet of the open pit. The Parish also said that it "didn't want the levee system to protect a bunch of holes." Plainly, a rational relationship between the legitimate interest of the Parish and the condition imposed on River Road was a precursor to the granting of the construction permit. The trial court in its reasons for judgment on the equal protection issue said, "As to any alleged equal protection violation, again, very little evidence was offered to establish that the Parish's requirement as to their property was not based on a rational basis or was so different from any other property owner so as to rise to constitutional dimensions."
Hence, there is no merit to appellants' argument and we find that the trial court was correct in its judgment that the enforcement of the construction permit against River Road and USF & G, under the facts of this case did not violate equal protection under the law nor due process of law.
DAMAGE AWARD
The Parish argues that the trial court erred in limiting the award for damages to the amount stipulated and secured by the surety bond, $252,000, with USF & G. The Parish contends that this amount is insufficient and does not reasonably reflect the cost of refilling the borrow pit.
In the Parish's original petition filed January 17, 1997, with the 25th JDC, they requested judgment against River Road and USF & G:
"... jointly, severally, and in solido, ordering performance pursuant to the permit obligation, and/or in the alternative, for damages in the amount of the reclamation bond of $252,000, with legal interest from date to default until paid, as well as the cost of these proceedings and reasonable attorney's fees."
In January of 2000, the Parish amended its petition asserting damages in excess of the $252,000, and that the bonded amount was insufficient to cover the present day cost of refilling. As part of its argument it urges that the amount is "so manifestly unreasonable as to be contrary to public policy." Lombardo v. Deshotel, 94-1172 (La.11/30/94), 647 So.2d 1086, 1090.
Our Supreme Court held in Lombardo,
When the creditor elects to sue the debtor for damages, when specific performance is impracticable, or when the court refuses within its discretion to *28 grant specific performance of an obligation to do, the fixing of the amount of the indemnity accorded as damages is made in two ways: (1) By the court, after the non-performance is established. C.C. Art.1999; 2 Planiol no. 246; or (2) By the parties themselves, in advance, by a stipulated damages clause inserted in the contract. C.C. Art.2005; Cf., 2 Planiol no. 246; See 4 Aubry et Rau, Droit Civil Francais, in 1 Civil Law Translations pp. 91-92 and pp. 120-122 (1965) The sum stipulated in the clause replaces the need for the damages to be set by the court. Stipulated damages may not be modified by the court unless they are so manifestly unreasonable as to be contrary to public policy, C.C. Art.2012; Cf., 2 Planiol nos. 255-266; 4 Aubry et Rau at 121-122; 2 Litvinoff ง 9, or if the obligor has partially performed. C.C. Art.2011.
La. C.C. art.2007, provides that "[a]n obligee may demand either the stipulated damages or performance of the principal obligation, but he may not demand both unless the damages have been stipulated for mere delay." La. C.C. art.2012 provides that stipulated damages may not be modified by the court unless they are so manifestly unreasonable as to be contrary to public policy. Article 2012 thus gives legislative sanction to the judicial prerogative to modify stipulated damages clauses, but it limits and channels that discretion to situations in which the stipulated damages are so disproportionate as to be contrary to public policy. The main tenet of Article 2012 is in harmony with classic civilian theory, and it is consistent with the solution adopted in modern codes and followed by recent Continental jurisprudence. Expose ้ Des Motifs, La.Civ.Code Ann., vol. 8-9 p. 47. Lombardo, at 1091
The trial court noted that the Parish did not broach the issue of the insufficiencies of the performance bond to cover the cost of the refilling of the pit until it filed its amended petition in January of 2000. In the original petition the Parish prayed for performance pursuant to a permit obligation and/or in the alternative for damages in the amount of the reclamation bond. This is of no moment considering that it has been determined that a non-performance has been established and that the parties had already agreed upon an amount to assure that the pit would be refilled. The trial court set the damages at the amount of the performance bond, $252,000. The error occurs in the trial court's failure to consider the reasonableness of the amount in the stipulation, as possibly being contrary to public policy.
The trial court in its reasons for judgment stated that:
The Parish determined the condition upon which the issuance of the permit would hinge. The Parish insisted that River Road must agree to fill the pit after completion of the project. The Parish required a surety bond to guarantee the performance of that condition, and the Parish determined the amount of that bond. River Road provided that bond containing a guarantee of filling in return for the issuance of the permit.
There was a contract with a determined condition. That condition has been breached by River Road construction. Specific performance is was [sic] a remedy not sought by the Parish at the trial of this matter and is considered to be a request abandoned. Neither is there evidence to determine its feasibility (there is no evidence that River Road still owns this land, for instance). In lieu of specific performance, the Parish is entitled to damages which they have stipulated to amount to [sic] $252,000.
*29 They are awarded that figure herein for River Road's breach.
The record reveals that Parish officials computed the figure of $252,000, based on the total number yards of material to be excavated multiplied by a dollar figure. This figure was determined based upon the amount of soil that River Road estimated would be necessary for the Army Corp of Engineers project # DACW 29-91-C-0007. The problem arises when River Road used less than the proposed amount of excavated soil for the levee project but continued to use more soil for other uses not disclosed in the record. What is in the record is Jens Lorenz's letter to the Parish asking for patience until he can bid another project, as there was more soil that could be excavated from the pit which was still functioning as an excavation site after the original project was complete. River Road continued to profit from the excavation beyond the stipulation in the original and only construction permit that it was operating under; it never sought to amend its construction permit as was suggested by Luke Petrovich. Moreover, in his deposition Jens Lorenz discloses that it is physically and financially possible to refill the pit by pumping sand from the river into the pit and that this had been his projected plan.
The Parish's expert, George William James, estimated that to refill the borrow pit would cost $1,133,012.00. The appellants' expert, Edward Geoffrey Webster, estimated that should the project be opened to public bid the amount necessary to refill the open pit would be approximately $651,992, an amount significantly higher than the $252,000, surety bond. Even if the amount of the surety bond is to be considered a stipulated damage award, the evidence proves that said amount is unreasonable by any estimation.
The Parish has a significant interest in both enforcing its building permit conditions and has a clear State interest in the preservation of its lands. Despite the important fact that River Road presumably holds title to the property in question it can in no way impede or circumvent the Parish's police powers for the safety and security of its citizens.
We therefore, remand the matter to the trial court to determine a fair amount of damages above the stipulated amount, to be paid to the Parish for the reclamation of the land pursuant to the breached construction permit and under its police powers. In all other respects we affirm the judgment of the trial court on the denial of the exception of prescription, and the denial of the appellants constitutional claims.
AFFIRMED IN PART AND REMANDED IN PART
PLOTKIN, J., Dissenting in Part.
PLOTKIN, J., Dissenting in Part.
For the reasons that follow I concur with the majority on the division of liability; however, I dissent on the issue of stipulated damages. In a case of stipulated damages, such as the instant case, it is unambiguous as to what the parties agreed. As the majority notes, "stipulated damages may not be modified by the court unless they are so manifestly unreasonable as to be contrary to public policy." Lombardo v. Deshotel, 94-1172 (La.11/30/94), 647 So.2d 1086, 1090. The majority claims that the stipulated damage award in this case is contrary to public policy. There is nothing in the majority's opinion to indicate that the $252,000 stipulated damages were unreasonable at the time that it was agreed upon. The majority argues that the damages should be greater than the stipulated amount since it would cost more than $252,000 to fill the pit today. This argument is flawed given the language of *30 C.C. Art.2007, which states, "an obligee may demand either the stipulated damages or performance of the principal obligation, but he may not demand both unless the damages have been stipulated for mere delay." In this case, the parties have contractually agreed on stipulated damages so they cannot now request specific performance. The majority's analysis would allow the Parish to recover damages in an amount equal to that required for specific performance. Both parties are bound by the amount that was set as part of the contractual stipulation. Thus, neither party can now receive specific performance or an amount equal to that type of indemnity. Therefore, it is unnecessary to remand this case to the trial court. The entire case, including the damage award, should be affirmed.
NOTES
[1] Ultimately, River Roads purchased the "Popovich Tract" from First Equity on April 24, 1991, conditional upon the obtaining all necessary permits to use the property as a borrow pit.
[2] 99-1832 (La.7/20/99), 747 So.2d 35.
[3] This statute was amended by Acts 1997, No. 491, ง 1, eff. July 3, 1997; Acts 1997, No. 1146, ง 1, which increased the time limitation to five years. The older statute sited is the language in the statute applicable at the time of the instant matter which conferred a two year limitation of action.
[4] The project began sometime after June 1991.
[5] It is not clear from the record if River Road actually bid the new project.
[6] Writ No. 99-C-0092 (La.App. 4 Cir. 5/25/99), 739 So.2d 1027.
[7] This tract of land was owned by Plaquemines Parish.