STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

14-245


PETER JOSEPH WHITBECK, ET UX.

VERSUS

ROBERT JOSEPH CHAMPAGNE, JR., ET UX.


**********

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 10-19086
HONORABLE PENELOPE QUINN RICHARD, DISTRICT JUDGE

**********

**JOHN E. CONERY**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and John E. Conery, Judges.


**AFFIRMED.**


Raymond B. Landry
Richard L. Traina
Mollere, Flanagan & Landry L.L.C.
2431 Metairie Road
Metairie, Louisiana 70001
(504) 837-4950
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Robert Joseph Champagne, Jr.
    Charlet Ann Champagne

**John M.Veron**
**J. Rock Palermo, III**
**Michael Glenn Hodgkins**
**Turner D. Brumby**
**Veron, Bice, Palermo & Wilson, L.L.C.**
**Post Office Box 2125**
**Lake Charles, Louisiana 70602-2125**
**(337) 310-1600**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Peter Joseph Whitbeck**
    **Marissa Jill Whitbeck**

**CONERY, Judge.**

Robert and Charlet Champagne (Champagnes) appeal the trial court's ruling granting a motion for summary judgment in favor of Peter and Marissa Whitbeck (Whitbecks). The trial court found the Champagnes in default of a July 2, 2012 Louisiana Residential Agreement to Buy and Sell (Purchase Agreement),[1] wherein the Champagnes agreed to purchase immovable property owned by the Whitbecks. The trial court ordered the Champagnes to specifically perform under the terms and provisions of the Purchase Agreement and pay the purchase price of $450,000.00 to the Whitbecks. The trial court also found that the Whitbecks were entitled to retain the $2,500.00 deposit given by the Champagnes and awarded $17,700.00 in attorney fees plus $2,764.35 in costs to the Whitbecks, with judicial interest from the date of judgment. The trial court denied the Whitbecks motion for summary judgment seeking an award of broker or realtor fees. The Whitbecks have answered the appeal and are seeking additional attorney fees and costs, an award of broker or realtor fees, and attorney fees and costs in connection with the appeal. For the following reasons, we affirm and award $2,500.00 in attorney fees to the Whitbecks for work done on this appeal.

## FACTS AND PROCEDURAL HISTORY

The Whitbecks' home at 111 Seagull Lane, Big Lake, Louisiana 70607 (Big Lake home) was listed on the market for sale. The Champagnes negotiated with

---

[1] Louisiana Revised Statutes 37:1449.1, effective January 1, 2011, requires all licensed real estate agents to use this form in connection with an offer to buy or sell residential real estate. Louisiana Revised Statutes 37:1449.1 provides:

> A licensee representing either the buyer or seller of residential real property shall complete the purchase agreement form prescribed by the Louisiana Real Estate Commission in making an offer to purchase or sell residential real property. No person shall alter the purchase agreement form; however, addendums or amendments to the form may be utilized.

the Whitbecks for the purchase of the Big Lake home and the parties subsequently agreed to a cash sale price of $450,000.00. The initial offer was made to the Whitbecks on June 30, 2012. The Whitbecks accepted the Champagnes' offer in writing by signing the Purchase Agreement on July 2, 2012.

Under the specific provisions of the Purchase Agreement, the Champagnes had a fifteen day period to fully inspect the Big Lake home and were allowed to conduct any inspections they deemed necessary. The inspection period began to run on July 3, 2012, the day after the Whitbecks accepted the Champagnes' cash offer, and ended on July 17, 2012.[2]

During the fifteen day inspection period, the Champagnes admit they were given free rein to inspect the Big Lake home and conducted at least three viewings or inspections of the home. One of the inspections was conducted by an engineer with Spell Structural Consulting, L.L.C., and included a structural review of both the interior and exterior of the Big Lake home. The conclusion of the engineering inspector was that the interior of the Big Lake home was "in good condition and no structurally deficient issues were observed with interior finishes."

---

[2] Lines 141-150 of the Purchase Agreement provide:

> Buyer shall have an inspection period of (15) calendar days, commencing the first day after acceptance of this agreement wherein, BUYER may, at BUYER'S expense, have any inspections made by experts or others of his choosing. Such inspections may include, but are not limited to, inspections for termites and other wood destroying insects, and/or damage from same, molds, and fungi hazards, and analysis of synthetic stucco, drywall, appliances, structures, foundations, roof, heating, cooling, electrical, plumbing systems, utility and sewer availability and condition, out-buildings, square footage, school district, flood zone classifications, current zoning and/or subdivision restrictive covenants and any items addressed in the SELLER'S Property Disclosure Document. All testing shall be nondestructive testing. SELLER agrees to provide the utilities for inspections and immediate access. If BUYER is not satisfied with the condition of the Property the BUYER may choose one of the following options within the inspection period[.]

2

In addition, the Whitbecks were required to disclose the following on the Property Disclosure Form, "Has there been property damage related to the land or the improvements thereon, including, but not limited to, fire, windstorm, flood, hail, lighting, or other property damage?" The Whitbecks responded "yes[,]" and that the repairs related to those damages, defects, and/or other conditions had been made to the Big Lake home.

During the fifteen day inspection period, the Champagnes asked for additional information about the repairs made, especially those made to the Big Lake home after Hurricane Ike. The Whitbecks responded on July 10, 2012, with a detailed listing and dates of when approximately ten repairs were made to the Big Lake home. The Whitbecks' response was sent to the Champagnes a week before the end of the fifteen day inspection period.

Under the provisions of the Purchase Agreement, if the Champagnes found any deficiencies in the Big Lake home within the fifteen day inspection period, they could "elect in writing, to terminate the Agreement and declare the Agreement null and void," or "indicate in writing the deficiencies and desired remedies," giving the Whitbecks as the sellers seventy-two hours to respond in writing as to their willingness to remedy those deficiencies.[3] The Champagnes did not exercise either of these options within the fifteen day inspection period.

Under the provisions of the Purchase Agreement, the Champagnes' silence was presumed acceptance once the fifteen day inspection period expired, as the

---

[3] Lines 152-155 of the Purchase Agreement provide:

> Option 1: BUYER may elect, in writing, to terminate the Agreement and declare the Agreement null and void; or Option 2: BUYER may indicate in writing the deficiencies and desired remedies and SELLER will within seventy two (72) hours respond in writing as to SELLER's willingness to remedy those deficiencies ("SELLER's Response").

Purchase Agreement stated that "FAILURE TO MAKE INSPECTIONS OR TO GIVE WRITTEN NOTICE OF DEFICIENCIES AND DESIRED REMEDIES TO SELLER (OR SELLER'S DESIGNATED AGENT) AS SET FORTH IN LINES 141 THROUGH 155 WITHIN THE INSPECTION PERIOD SHALL BE DEEMED AS ACCEPTANCE BY BUYER OF THE PROPERTY'S CURRENT CONDITION."

In addition, under the terms of the Purchase Agreement, the Champagnes agreed to accept the Big Lake home in an "'as is' condition" and to "waive, relieve and release" the Whitbecks from any further actions for redhibition and reduction of the sale price. The Champagnes also acknowledged the sale of the Big Lake home was to be made "without warranty of fitness for ordinary or particular use" and that both parties agreed that this language was to be part of the Act of Sale.[4]

Based on the Champagnes' silence and deemed acceptance of the condition of the Big Lake home, the parties proceeded with the sale process. They mutually agreed to close the sale of the Big Lake home on Monday, July 23, 2012. However, on the morning of July 23, 2012, the Champagnes informally notified the Whitbecks of their intention not to finalize the sale. The Champagnes indicated they had received information from a third-party that the Big Lake home had a "mold and mildew issue." This informal notification by the Champagnes of a

---

[4] Lines 189-195 of the Purchase Agreement provide:

> B. SALE "AS IS" WITHOUT WARRANTIES: SELLER and BUYER hereby acknowledge and recognize that the Property being sold and purchased is to be transferred in "as is" condition and further BUYER does hereby waive, relieve and release SELLER from any claims or causes of action for redhibition pursuant to Louisiana Civil Code Article 2520, *et seq.* and Article 2541, *et seq.* or for reduction of Sale Price pursuant to Louisiana Civil Code Article 2541, *et seq.* Additionally, BUYER acknowledges that this sale is made without warranty of fitness for ordinary or particular use pursuant to Louisiana Civil Code Article 2524. SELLER and BUYER agree that this clause shall be made a part of the Act of Sale.

potential "mold and mildew issue" was the first time the Whitbecks were notified that the Champagnes had any reservations about either the condition of the Big Lake home or finalizing the sale of the property.

The next day, July 24, 2012, the Champagnes formally notified the Whitbecks of their intention not to purchase the Big Lake home. The Champagnes gave as their only reason that they had elected "not to move forward with the purchase of the above mentioned property on the basis of non disclosure by the sellers." They further requested "release of the escrowed funds of $2,500.00." In response, and in order to dispel the third-party rumor of mold and mildew issues, the Whitbecks gave the Champagnes complete freedom to take whatever steps they deemed necessary to satisfy themselves that the Big Lake home was free from mold and mildew. This offer by the Whitbecks to the Champagnes was confirmed by Mr. Champagne under oath. He testified that his own real estate agent, Mrs. Rhonda Gaspard, informed him that the Whitbecks were willing to allow the Champagnes to conduct all inspections necessary to confirm that mold was not present in the Big Lake home. In an effort to break the impasse between the parties and to impress on the Champagnes the seriousness of their actions in refusing to complete the sale as per the Purchase Agreement, Mrs. Gaspard, in a July 23, 2012 correspondence, urged the Champagnes to "investigate further" in order to determine if there was a real basis for the third-party mold rumor. She also suggested that the Champagnes have someone check with a moisture meter for any moisture in the walls or tear out the sheetrock in the suspected area.

Mrs. Gaspard also told the Champagnes that her broker, Tim Flavin, was of the opinion that the Champagnes were contractually bound to close on the Big Lake home unless they could prove there was a mold problem and that it had been

covered up by the Whitbecks. Mrs. Gaspard further informed the Champagnes that the Whitbecks intended to seek specific performance of the Purchase Agreement. She then suggested, once again, that the sheetrock be torn out in the area in question and that an expert be called to confirm the absence or presence of mold or any structural defects.

The Champagnes never took advantage of the Whitbecks' offers to conduct any and all inspections necessary to satisfy themselves that the Big Lake home was mold free. It is undisputed that the Champagnes never hired anyone to conduct a mold assessment of the Big Lake home. Due to the Champagnes failure to address the mold rumor, and in an attempt to resurrect the sale, the Whitbecks hired their own environmental professional, Booth Environmental Services, LLC (Booth). Booth performed a "Moisture and Mold Assessment Sampling" and a "MOLD ASSESSMENT REPORT," dated August 6, 2012. The report, which was introduced into evidence, contained two opinions. In the first Booth opinion, the Booth inspector states, "according to the air samples, the indoor area is not considered to be elevated at the time of the inspection." The Booth opinion also states, "there was also no visible evidence observed by the Booth Environmental staff to suggest that an issue existed with elevated mold at the time of inspection."

The Whitbecks sent a copy of the Booth report to the Champagnes on August 8, 2012, and insisted that they finalize the sale. The Champagnes maintained their position and refused to close the sale of the Big Lake home, despite taking no steps to provide evidentiary support for their contention that the Whitbecks failure to disclose a mildew and mold problem in the Big Lake home was a breach of the Purchase Agreement.

6

Ms. Rhonda Gaspard, the Champagnes' realtor, requested that the Champagnes obtain an affidavit from Mr. Stanley Schiele, a local contractor, and the supposed "third-party source" of the mold rumor at the Big Lake home. The affidavit was not forthcoming until two months after the initial July 23, 2012 closing date for the sale of the property. Mr. Schiele's affidavit failed to support the Champagnes' contention that the Whitbecks had failed to disclose a mold problem in the Big Lake home and only stated there was "potential for mold." Mr. Schiele also testified via deposition that despite working as a contractor in the area for a number of years, he "never encountered any black mold in the Big Lake area."

The Whitbecks filed suit against the Champagnes on September 5, 2012, seeking specific performance [5] of the Purchase Agreement, retention of the Champagnes' deposit, both attorney and broker fees, and costs.[6] The Whitbecks claimed that the Champagnes had breached the Purchase Agreement by failing to complete the sale on the Big Lake home. The Champagnes reconvened seeking the return of their deposit, along with costs and attorney fees.

At the close of discovery, during which the depositions of the parties, the realtors and Mr. Schiele, the source of the third-party mold rumor, were taken, the

---

[5] Lines 228-232 of the Purchase Agreement provide:

> DEFAULT OF AGREEMENT BY BUYER: In the event of any other default of this agreement by BUYER except as set forth in lines 103 through 122, SELLER shall have at SELLER's option the right to declare this Agreement null and void with no further demand, or to demand and sue for any of the following:
> 1) Termination of this Agreement; 2) Specific Performance; 3) Termination of this Agreement and an amount equal to 10% of the Sale Price as stipulated damages.

[6] Lines 234-236 of the Purchase Agreement provide, "Further, SELLER shall be entitled to retain the Deposit. The prevailing party to any litigation brought to enforce any provision of this Agreement shall be awarded their attorney fees and costs. The BUYER may also be liable for Broker fees."

Whitbecks filed a motion for summary judgment. A hearing on the Whitbecks' motion was held on July 24, 2013. After considering all the depositions, pleadings, and affidavits in support of and in opposition to the motion, the trial court granted the Whitbecks' motion for oral reasons assigned. The trial court ruled that the Whitbecks were entitled to specific performance of the Purchase Agreement and awarded judgment in the amount of $450,000.00 to the Whitbecks in accordance with the contract. The trial court also allowed the Whitbecks to retain the $2,500.00 deposit without credit toward the sales price, plus costs, and indicated it would make an award of attorney fees. The court ordered briefing and set an additional hearing for September 4, 2013, on both the attorney and broker fees issue.

Counsel for the Whitbecks submitted a detailed attorney fees claim for $30,850.00. After receipt of post-motion briefing, the trial court held the September 4, 2013 hearing as scheduled. On September 30, 2013, the trial court issued its written ruling and awarded the Whitbecks $17,700.00 in attorney fees, approximately half the amount claimed, plus costs of $2,764.35. The trial court also denied the Whitbecks' request for broker fees. A final judgment was signed on October 29, 2013, from which the Champagnes have filed a timely suspensive appeal. The Whitbecks have answered the appeal and seek an increase of the attorney fees award to $30,850.00, the original amount claimed, an award of broker's fees, plus attorney fees and costs for the appeal.

## ASSIGNMENTS OF ERROR

The Champagnes argue the trial court erred by granting the Whitbecks' motion for summary judgment and ordering specific performance of the Purchase Agreement.

In their answer to appeal, the Whitbecks argue that the trial court erred in not granting the total amount of attorney fees sought and in failing to award the Whitbecks broker or realtor fees. The Whitbecks seek an additional award of attorney fees and costs for the appeal.

**LAW AND DISCUSSION**

*Standard of Review*

Summary judgments are reviewed de novo, applying the same standard to the matter as that applied by the trial court. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512 (La. 7/5/94), 639 So.2d 730. Summary judgment is favored by law and provides a vehicle by which the just, speedy, and inexpensive determination of an action may be achieved. La.Code Civ.P. art. 966(A)(2). The trial court is required to render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B)(2). In this case, all documentation in support of and in opposition to the Whitbecks motion for summary judgment was properly admitted into evidence at the July 24, 2013 hearing. Though heard as a motion for summary judgment, it appears that the parties in effect introduced the entirety of the evidence by way of depositions, affidavits, and exhibits, and the Court, after considering all the evidence submitted at the hearing, made a ruling that no material facts remained for trial.

In 1997, the legislature enacted La.Code Civ.P. art. 966(C)(2), which clarified the burden of proof for a summary judgment proceeding. The initial burden of proof remains with the mover to show that no genuine issue of material

fact exists. If the mover has made a prima facie showing that the motion should be granted, the burden shifts to the non-moving party to present evidence demonstrating that a genuine material factual issue remains. *Id.* "[T]he failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion." *Hutchinson v. Knights of Columbus, Council No. 5747*, 03-1533, p. 7 (La. 2/20/04), 866 So.2d 228, 233.

When a motion for summary judgment is made and supported, the adverse party may not rest on the allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. La.Code Civ.P. art. 967(B). "A fact is 'material' when its existence or nonexistence may be essential to [a] plaintiff's cause of action under the applicable theory of recovery. *Smith*, 639 So.2d at 751. "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." *Id.* (quoting *S. La. Bank v. Williams*, 591 So.2d 375, 377 (La.App. 3 Cir. 1991), *writ denied,* 596 So.2d 211 (La.1992)).

In determining whether a fact is material, we must consider the substantive law governing the litigation. *Davenport v. Albertson's, Inc.*, 00-685 (La.App. 3 Cir. 12/6/00), 774 So.2d 340, *writ denied*, 01-73 (La. 3/23/01), 788 So.2d 427. In this case, the substantive law of contracts is applicable.

Questions of contractual interpretation are questions of law, which are subject to a de novo standard of review. *Mitchell v. Patterson Ins. Co.*, 00-612 (La.App. 3 Cir. 12/6/00), 774 So.2d 366. Contracts have the force of law between the parties, and the courts are bound to interpret them according to the common intent of the parties. La.Civ.Code arts. 1983 & 2045. If the words of the contract are clear, unambiguous, and lead to no absurd consequences, the court need not

10

look beyond the contract language to determine the true intent of the parties. La.Civ.Code art. 2046. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La.Civ.Code art. 2050. Whether or not a contract is ambiguous is a question of law. *La. Ins. Guar. Ass'n. v. Interstate Fire & Cas. Co.*, 93-911 (La.1/14/94), 630 So.2d 759.

***Terms of the Purchase Agreement***

If the terms of the Purchase Agreement at issue are "clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La.Civ.Code art. 2046." *Gonsoulin v. Pontiff,* 11-177, p. 5 (La.App. 3 Cir. 10/5/11), 74 So.3d 809. In this case, the Purchase Agreement at issue is the standard form required by the Louisiana Real Estate Commission in connection with the sale and or purchase of a residential property. Thus, the trial court correctly found in its reasons for granting the Whitbecks' motion for summary judgment that the contract was clear and unambiguous and therefore the law between the parties:

> The Court finds that the contract in this matter is clear and unambiguous. It's the law between the parties. The depositions confirm that the parties understood the contents of the contract. And it's clear from the depositions and the contract that the Champagnes breached their duty under the contract.
>
> So the Court's going to grant the motion for summary judgment in favor of the plaintiffs; order specific performance; order the sellers retain the deposit; award attorney fees to be determined at a hearing, at a date and time set today. And the contract says, "May order broker fees." I will determine at that hearing whether broker fees will be awarded.

The Champagnes argue that there are genuine issues of material fact that preclude summary judgment in this case. However, in light of the depositions and

11

exhibits submitted by the Whitbecks and the clear and unambiguous wording of the Purchase Agreement, we cannot agree. When a motion for summary judgment is made and supported, the adverse party may not rest on the allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. La.Code Civ.P. art. 967(B).

The Champagnes failed to produce any expert testimony to support their claim that the Whitbecks had failed to disclose the presence of mold or any structural defect. Mr. Champagne testified in his deposition, after a discussion about the mold inspection commissioned by the Whitbecks, that they had "no scientific evidence to refute" the conclusions of Booth that there was no mold present in the Big lake home.

Neither the affidavit nor the deposition testimony of Mr. Schiele supports the Champagnes' claim that the Whitbecks failed to disclose the presence of mold. Mr. Schiele testified under oath that water spots he observed on a ceiling in one of the rooms only have the "potential for mold" and that he had never encountered "black mold" in the Big Lake area.

The Champagnes also argue the Whitbecks failed to disclose that a window had been replaced in the same room which had water spots on the ceiling. This issue was thoroughly discussed by Mr. Schiele in his deposition as a "potential" source of mold. However, Mr. Schiele also confirmed that he never saw mold in the Big Lake home.

The Property Condition Disclosure Form was not a part of the record, but we

allowed the parties to supplement the record with the form and have reviewed it.[7] The alleged undisclosed repairs were thoroughly discussed in the deposition of Mr. Champagne wherein he admitted that he had no evidentiary support that any alleged undisclosed repairs by the Whitbecks met the definition of a "Known defect" on the Property Disclosure Form. A "Known defect" is defined in the Property Disclosure Form, as "a condition found within the property that was actually known by the seller and that results in one or all of the following." The "Known defect" either presents a "substantial adverse effect on the value of the property," "significantly impairs the health or safety of any future occupants[,]" or "significantly shortens the expected normal life of the premises" if the repairs are not made.

Based on the uncontradicted evidence submitted at the motion for summary judgment, and the clear terms of the Purchase Agreement, we find there is no genuine issue of material fact to defeat the Whitbecks' motion for summary judgment.

The Champagnes were given carte blanche to inspect the house by the Whitbecks, who asserted all through this process that they had nothing to hide. The Champagnes were free to take any measures necessary to assure there was no mold or structural defect present in the Big Lake house, including tearing out the sheetrock in the bedroom in question, as recommended by their realtor. The Champagnes failed to do so.

The Champagnes have failed to present any documentary evidence or testimony to create a genuine issue of material fact sufficient to defeat the motion

---

[7] The Property Disclosure Form is now required by the Louisiana Real Estate Commission as provided by La.R.S. 9:3196, *et seq*. The form used was in compliance with the statute.

for summary judgment sought by the Whitbecks. We affirm the trial court's ruling granting summary judgment to the Whitbecks for the Champagnes breach of the Purchase Agreement.

*Stipulated Damages in the Purchase Agreement*

The Champagnes argue that the trial court erred in granting specific performance in favor of the Whitbecks and ordering them to execute the Purchase Agreement for the cash price of $450,000.00. The Purchase Agreement clearly states that "specific performance" is one of the three options available to the Seller when the Buyer breaches the Purchase Agreement. The Purchase Agreement states that the seller may "demand and sue for any of the following: 1) Termination of this Agreement; 2) Specific Performance; 3) Termination of this Agreement and an amount equal to 10% of the Sale Price as stipulated damages."

The Champagnes argue that the trial court is required to choose the option to be exercised in the event of a breach of the Purchase Agreement. However, the clear language of the Purchase Agreement provides, "SELLER shall have at SELLER's option the right" to choose the remedy for the Champagnes' breach of the Purchase Agreement. Documentation presented in support of the motion for summary judgment clearly provides that from the date of the closing when the Champagnes refused to go through with the sale, the Champagnes were on notice from both their broker, Tim Flavin, and their realtor, Rhonda Gaspard, that the Whitbecks intended to seek specific performance of the Purchase Agreement should the Champagnes choose not to perform.

Louisiana Civil Code Article 1986 provides:

Upon an obligor's failure to perform an obligation to deliver a thing or not to do an act, or **to execute an instrument, the court shall grant specific performance plus damages for delay** if the obligee so

14

demands. If specific performance is impracticable, the court may allow damages to the obligee.

Upon a failure to perform an obligation that has another object, such as an obligation to do, the granting of specific performance is at the discretion of the court.

(Emphasis added.)

In *Charter Sch. of Pine Grove v. St. Helena Parish Sch. Bd.*, 07-2238, p.14 (La.App. 1 Cir. 2/19/09), 9 So.3d 209, 222, our sister circuit succinctly discussed La.Civ.Code art. 1986 and the jurisprudence applicable to a breach of a contract that contains a provision for specific performance:

> Upon an obligor's failure to perform an obligation to do, the granting of specific performance is at the discretion of the court. *See* LSA–C.C. art.1986. Under Louisiana's civil law system, specific performance is the preferred remedy for breach of contract. An obligee enjoys the right to demand, insofar as is practicable, the specific performance of the obligation. *Lombardo v. Deshotel*, 94–1172 (La.11/30/94), 647 So.2d 1086, 1090; *see* LSA–C.C. art.1986. An obligee has a right to specific performance for breach of contract except when it is impossible, greatly disproportionate in cost to the actual damage caused, no longer in the creditor's interest, or of substantial negative effect upon the interests of third parties. *J. Weingarten, Inc. v. Northgate Mall, Inc.*, 404 So.2d 896, 901 (La.1981).

The Champagnes argue that the trial court erred in enforcing the Whitbecks' claim for specific performance for the agreed upon sum of $450,000.00 cash, as it would be "impracticable" to force the Champagnes to acquire ownership of the Big Lake home. After the purchase, if the alleged defect of mold was discovered, the discovery would lead to another lawsuit, an action in redhibition, pursuant to La.Civ.Code art. 2520.

However, under the explicit terms of the Purchase Agreement, the Champagnes agreed, "the Property being sold and purchased is to be transferred in 'as is' condition and further BUYER does hereby waive, relieve and release

SELLER from any claims or causes of action for redhibition pursuant to Louisiana Civil Code Article 2520, *et seq.* and Article 2541, *et seq.* or for reduction of Sale Price pursuant to Louisiana Code Article 2541, *et seq.*" They also agreed, "[t]hat this sale is made without warranty of fitness for ordinary or particular use pursuant to the Louisiana Civil Code Article 2524. SELLER and BUYER agree that this clause shall be made a part of the Act of Sale."

In *Ross v. Premier Imports*, 96-2577 (La.App. 1 Cir. 11/7/97), 704 So.2d 17, 21, *writ denied*, 97-3035 (La. 2/13/98), 709 So.2d 750, the first circuit provided that a seller may "limit his obligations as seller, providing he does so clearly and unambiguously." In *Keaty v. Moss Motors*, *Inc.*, 93-1452 (La.App. 3 Cir. 6/1/94), 638 So.2d 684, 687, *writ denied*, 94-2211 (La. 11/11/94), 644 So.2d 399, a panel of this court specified that for the conditions necessary for the waiver to be effective, the contractual waiver must, "(1) be written in clear and unambiguous terms; (2) be contained in the contract; and, (3) either be brought to the attention of the buyer or explained to him."[8]

The trial court specifically found that the contract was "clear and unambiguous" and that it was "the law between the parties." In addition, the trial court found that "the depositions confirm the parties understood the contents of the contract." Based on the trial court's findings that there was no genuine issue of material fact, and our review of the Purchase Agreement and the record, we find that the uncontradicted facts support the conclusion that the provisions of the contract are enforceable against the Champagnes and present no bar to the remedy of specific performance granted by the trial court. This conclusion is further

_____

[8] Louisiana Civil Code Article 2548, amended by La. Acts 1993, No.841 § 1, codified the jurisprudential requirements and became effective January 1, 1995.

supported by the Champagnes' failure to produce any evidence to support their contention that the Big Lake home contained mold or any defect that would qualify as a basis for refusal to honor the Purchase Agreement.

Louisiana Civil Code Article 2005 allows parties to "stipulate the damages to be recovered in case of nonperformance, defective performance, or delay in performance of an obligation." Further, "[T]hat stipulation gives rise to a secondary obligation for the purpose of enforcing the principal one." Louisiana Civil Code Article 2012 also instructs, "Stipulated damages may not be modified by the court unless they are so manifestly unreasonable as to be contrary to public policy." Neither party has argued that the stipulated damages are "so manifestly unreasonable as to be contrary to public policy." *Id.*

The parties agreed in the Purchase Agreement to a cash price for the Big Lake home of $450,000.00. The trial court granted specific performance to the Whitbecks based on the stipulated damage provisions in the Purchase Agreement and ordered the Champagnes to perform according its terms, finding the Purchase Agreement was "the law between the parties."

In *Stumpf v. Richardson*, 99-415, p. 5 (La.App. 5 Cir. 11/30/99), 748 So.2d 1225, 1227-28, the trial court found that the contract included a clause for specific performance, that the terms of the contract had been met, and thus granted specific performance to the sellers and ordered the buyer to pay the agreed to price of $525,000.00. The buyer refused to complete the sale for the negotiated price of $525,000.00, the value of the property in the lender's appraisal, after having the property appraised at $378,000.00 in her separate appraisal. The court in *Stumpf* based its ruling on *City of Kenner v. Jumonville*, 97-125 (La.App. 5 Cir. 8/27/97), 701 So.2d 223, 228, *writ denied*, 97-2890 (La.1/30/98), 709 So.2d 718, *cert.*

17

*denied*, 524 U.S. 953, 118 S.Ct.2371 (1998), and stated, "Courts 'cannot undermine a contract simply because it was a bad deal, or is believed to be, for one of the parties.'"

The same principle applies in this case. We agree with the trial court that specific performance was properly granted as a remedy to the Whitbecks for the Champagnes' failure to perform under the clear terms of the Purchase Agreement.

### *Duty to Mitigate*

The Champagnes argue that the Whitbecks had a duty to mitigate the stipulated damages by continuing to market their Big Lake home to try and find another buyer for the property. Louisiana Civil Code Article 2002 provides, "An obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform. When the obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced." In *Lombardo v. Deshotel*, 94-1172 (La. 11/30/94), 647 So.2d 1086, the supreme court discussed the conflict between La.Civ.Code art. 2002 and stipulated damage provisions in a contract. In *Lombardo*, the supreme court held that La.Civ.Code art. 2002 was not applicable and there was no duty on the part of the obligee to mitigate his damages when stipulated damages were part of the contractual obligation of the obligor:

> The obligee can recover no more nor less than the stipulated damages regardless of the amount of damage or the consequences caused by the obligee's neglect. Consequently, because the seller, Lombardo, could not suffer a reduction of her stipulated damages and therefore owed **no duty to mitigate her damage to the purchaser**.

*Lombardo*, 647 So.2d at 1092 (emphasis added).

We agree that the trial court correctly interpreted the terms of the Purchase Agreement providing for specific performance by requiring the Champagnes to

18

perform under the terms of the Purchase Agreement and purchase the Big Lake home for the agreed to cash price of $450,000.00.

### *Remaining Damages Awarded by the Trial Court*

The Purchase Agreement also provides, "Further, SELLER shall be entitled to retain the Deposit. The prevailing party to any litigation brought to enforce any provision of this Agreement shall be awarded their attorney fees and costs. The BUYER may also be liable for Broker fees."

The trial court, under the provisions of the Purchase Agreement, correctly awarded the $2,500.00 deposit to the Whitbecks without a reduction of the purchase price of the Big Lake home. Also, under the terms of the Purchase Agreement, the trial court awarded the Whitbecks their requested costs of $2,764.35. The Champagnes did not brief either of these issues to this court on appeal and therefore pursuant to Uniform Rules—Courts of Appeal, Rule 2–12.4, these issues are considered abandoned.

### *The Whitbecks' Answer to Appeal*

The Whitbecks have answered the appeal and seek the following, "(i) a modification of the trial court judgment to increase the award of attorneys' fees, (ii) a modification and/or reversal of the judgment to grant an award of broker fees, and (iii) an award of attorneys' fees and costs incurred in connection with this appeal."

### *Attorney Fees*

After granting the Whitbecks' motion for summary judgment, the trial court deferred ruling on the attorney fee and broker's fee issues and requested that counsel submit a post hearing memoranda on these issues. The trial court then heard oral argument on these issues at a hearing on September 4, 2013. In support

of their request for attorney fees and costs, Turner D. Brumley, counsel for the Whitbecks, had submitted a memorandum and a sworn affidavit with documentation supporting one hundred and eighteen hours of work on the Whitbecks' lawsuit for a total of $30,850.00 in attorney fees and $2,764.35 in costs.

In their opposition memorandum, counsel for the Champagnes claimed that the amount of attorney fees "requested by the Whitbecks for attorney fees is about twice as much as would be appropriate under the circumstances revealed by the record of this proceeding." Counsel for the Champagnes did not challenge the hourly rate of the Whitbecks' attorneys, but argued in its memorandum, without any documentation, that the Whitbecks' attorneys should have only spent half as much time on the case as claimed.

In response, at oral argument, counsel for the Whitbecks asked that the Champagnes' attorneys submit their bills in-camera and thus allow the trial court to compare the attorney fees for both parties to see if the Whitbecks' attorneys should have only spent fifty hours on the case. The trial court then allowed the attorneys for the Champagnes ten days to provide the court with "a detailed accounting of their attorney fees in this matter," for an in-camera inspection.

After the requested submission from counsel for the Champagnes, the trial court issued a ruling on September 30, 2013. The Champagnes' attorney fees accounting is not in the record before us and cannot be considered, as provided in La.Code Civ.P. art. 2164. The trial court stated as its basis for reducing by almost half the attorney fees requested by the Whitbecks, "After review of the attorney fees requested and incurred by the parties in this case and the jurisprudence on reasonable attorney fees, the Court will award $17,700 as a reasonable attorney fee to the plaintiffs; expenses incurred by the plaintiffs in the amount of $2,764.35."

20

In *Covington v. McNeese State Univ.*, 12-2182, p. 6 (La. 5/7/13), 118 So.3d 343, 348, the supreme court held, "The appellate court reviews an award of attorney's fees for an abuse of discretion. The district court's factual determinations will not be set aside absent manifest error. *Stobart v. State, Dep't of Trans. and Dev.*, 617 So.2d 880, 882 n. 2 (La.1993)."

The supreme court in *State, Department of Transportation and Development v. Williamson*, 597 So.2d 439, 441-42 (La.1992), outlined the factors that must be considered by a court in reviewing an award of attorney fees:

> Factors to be taken into consideration in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.

The trial court was in the best position to determine the fairness of the award of attorney fees. After reviewing the Champagnes' documentation, which is not in the record before us, the trial court exercised its much discretion and awarded attorney fees of $17,700.00 to the Whitbecks. We cannot say that the amount so awarded was an abuse of the trial court's discretion.

### Broker Fees

The Purchase Agreement states, "The BUYER may also be liable for Broker fees." The Whitbecks seek $26,000.00 in broker/realtor fees based on the sale price of the Big Lake home in the Purchase Agreement, the delay occasioned by the Champagnes' breach of the terms of the Purchase Agreement, and the necessity of filing this litigation.

The trial court declined to award broker's fees and stated in its ruling "Finally, I will deny the plaintiffs' request for broker fees in this matter." The Purchase Agreement, which controls, allows the trial court the discretion to award broker's fees. We cannot say that the trial court abused its considerable discretion.

### Attorney Fees on Appeal

The Champagnes argue that the Whitbecks are not entitled to attorney fees for work on the appeal. However, this circuit specifically held in *McFadden v. Import One, Inc.*, 10-952, p. 16 (La.App. 3 Cir. 2/9/11), 56 So.3d 1212, 1223:

> When an award for attorney's fees is granted at a lower court level, the recipient of those fees is entitled to additional fees for work done on appeal. This keeps the appellate judgment consistent with the underlying judgment. *Wilczewski v. Brookshire Grocery Store,* 08–718, p. 18 (La.App. 3 Cir. 1/28/09), 2 So.3d 1214, 1226, *writ denied,* 09–456 (La.4/13/09), 5 So.3d 170.

Based on the work performed by counsel for the Whitbecks on appeal, we find that $2,500.00 is a reasonable award. We therefore grant the request of the Whitbecks for attorney fees on appeal and award attorney fees in the amount of $2,500.00, plus all costs of the appeal.

### CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment in favor of Peter and Marissa Whitbeck and against Robert and Charlet Champagne. We find the Champagnes in breach of the June 30, 2012 Purchase Agreement and order the Champagnes to specifically perform by paying $450,000.00 in cash under the terms and provisions of the Purchase Agreement. We affirm the trial court's judgment allowing the Whitbecks to retain the $2,500.00 deposit, without an offset against the sales price, all with legal interest from the date of judgment, plus the award of costs to the Whitbecks in the amount of $2,764.35. We affirm the trial

22

court's award of $17,700.00 in attorney fees and we award the Whitbecks $2,500.00 as attorney fees for work on the appeal.  We assess all costs of this appeal to Robert and Charlet Champagne.

**AFFIRMED.**